# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>ROY J. KEOUGH,<br><br>    Defendant. | No. CR05-3003-MWB<br><br>**ORDER CONCERNING MAGISTRATE'S REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION TO SUPPRESS** |

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On January 19, 2005, a two count indictment was returned against defendant Roy J. Keough charging him with manufacturing or attempting to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 851, and possessing methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 851. On June 24, 2005, defendant Keough filed a motion to suppress. In his motion, defendant Keough seeks to have evidence seized by the police from his mobile home suppressed on the ground that he did not consent to the search of the mobile home. Defendant Keough also asserts that the consent to the search of a room in the mobile home was not voluntary. Defendant Keough's motion to suppress was referred to United States Magistrate Judge Paul A. Zoss, pursuant to 28 U.S.C. § 636(b). On July 21, 2005, Judge Zoss filed a Report and Recommendation in which he recommends that defendant Keough's motion to suppress be granted. Judge Zoss

concluded that there was neither probable cause nor exigent circumstances before the officers entered the back bedroom of the mobile home. Judge Zoss further found that although Keough gave his consent to the search of the mobile home, such consent was not voluntary. Therefore, Judge Zoss recommended that defendant Keough's motion to suppress be granted. Neither the government nor defendant Keough have filed objections to Judge Zoss's Report and Recommendation.

### B. *Factual Background*

In his Report and Recommendation, Judge Zoss made the following findings of fact:

> On November 12, 2004, Officer Greer received an anonymous call about an ether odor at a trailer park in Mason City, Iowa. The caller stated the odor seemed to be emanating from a particular trailer, and noted all the windows were open in the trailer. Officer Greer has experience investigating methamphetamine labs, and he knew that ether often is used in the methamphetamine manufacturing process. He also knew ether is a volatile, hazardous substance. He contacted his supervisor, Officer Stearns, and stated he was going to the trailer park to investigate the odor.
> Officer Greer went to the trailer park immediately. He was wearing plain clothes and was driving an unmarked vehicle. The officers decided Officer Greer would walk around the trailer in question and see if he could detect the odor, while Officer Stearns, who was in uniform and driving a marked police vehicle, would wait until he heard from Officer Greer before taking further action. Officer Greer walked past the trailer and then back again. It was a windy day, and on his first pass by the trailer, he did not detect an odor, but when he walked back by the trailer again, he detected a brief ether odor.
> Officer Greer notified Officer Stearns of his findings, and he asked Officer Stearns to come to the location and see if

he could smell the odor.  While Officer Greer was waiting for Officer Stearns to arrive, he saw a blue vehicle being driven by a male, later identified as Keough, arrive and pull into the driveway in front of the trailer in question.  When Officer Stearns arrived, both of the officers got out of their vehicles and approached Keough, who had just gotten out of the blue car.  The officers identified themselves as police officers, and told Keough they were investigating a complaint of an ether odor.  They asked Keough if he had anything in his trailer that could be producing a chemical odor.  While they were talking with Keough, Officer Greer noticed Keough had several scabs or cuts on the backs of his hands.  This raised Officer Greer's suspicion because he knew cuts and sores can be related both to methamphetamine use and to the manufacturing process.

Keough told the officers he had used a chemical cleaner in the process of refinishing a floor just inside his trailer.  Officer Greer asked if the officers could see the area, and Keough agreed they could.  He led the officers to the front door of his trailer, and used his key to open the front door.

The above facts basically are undisputed.  The court will now set forth the disputed facts, beginning with the officers' version of events, and then setting forth Keough's version.

The Officers' Version of Events

The officers asked Keough if he knew anything about an ether odor that could be coming from his trailer.  According to both of the officers, Keough said he knew nothing about an ether odor, he was not involved in any type of drug activity, he was just a hard-working guy, and the officers could search him, his car, and his house because he had nothing to hide.  The officers asked if they could see the area where Keough had been stripping his floor, and Keough led them up the deck stairs to the door.  He opened the trailer and led them inside.  Keough walked in the door first, and they walked in right after him.

As soon as they stepped inside, Keough said he had

been refinishing the floor just inside the door. He lifted up the carpet and showed them. Officer Greer detected a chemical odor at that point, but it was different from the odor he had smelled outside and it was not an ether smell. He did not detect an ether odor inside the trailer. Officer Stearns continued talking with Keough while Officer Greer looked around the entryway area. Eventually, Officer Stearns asked if the officers could look around the inside of the trailer. Keough agreed, and he walked the officers down the hall to a back bedroom that was locked with a large padlock. On the way to the back bedroom, Keough and the officers walked through the living room, past one bedroom, and past the bathroom, to the end of the hallway. Keough used a key to unlock the padlock on the door of the back bedroom and led the officers into the bedroom.

Keough entered the bedroom first, followed by Officer Stearns and then Officer Greer. When Keough first entered the bedroom, Officer Stearns saw him make a quick movement, like he was trying to put something in a dresser drawer. He asked Keough what he was doing, and the officer then saw a metal tray containing a couple of glass pipes, which Keough stated were "crank pipes." Officer Greer did not see the pipes or the tray because the bedroom was quite small, and he could not see around Keough and Officer Stearns. However, he did see a chair sitting by the door, and he noticed the chair was empty.

Officer Stearns asked Keough if he had any controlled substances on him. Keough said he did not, and he thrust his hands into his pockets and pulled out a small knife, which he threw on the bed. Officer Stearns then searched Keough. While this was taking place, Officer Greer noticed there was a black pouch on the chair by the bedroom door. He told Officer Stearns about the pouch, stating nothing had been on the chair just a couple of minutes before. Officer Greer opened the pouch and looked inside. He saw several small baggies containing white powder. When the officers asked Keough whose fingerprints they would find on the baggies,

4

Keough replied, "Roy James Keough."

The officers placed handcuffs on Keough, and took him out to the living room, where they sat him on a sofa. They had another officer bring a Permission to Search form to the trailer. They explained the form to Keough, uncuffed him, and he signed the form. Both officers stated Keough had told them several times that they could search all they wanted because he had nothing to hide and they would not find anything illegal. Officers continued their search of Keough's trailer and an outbuilding, and they located numerous items of contraband.

Keough's Version of Events

Keough tells a different story. When he arrived at his trailer on the afternoon in question, he was returning from work where he performed maintenance at a hotel. The scratches on his hands were from his job.

Keough pulled up to the trailer in his car and two men walked up to him. He got out of his vehicle and asked if he could help them. They identified themselves as police officers, and Officer Greer stated they were investigating a phoned-in complaint of a strong chemical odor in the area. The officer addressed Keough as "Roy," although Keough did not recall ever meeting the officer before that day, and he asked Keough if he had anything in his house that would cause an odor. Keough responded that he had used a chemical solvent to strip his floor. Officer Greer asked if they could "see it" and Keough agreed.

Keough and the officers walked up to the trailer. Keough took a key off of his belt loop, unlocked the front door, and replaced the key on his belt loop. He opened the door and stepped inside his entryway, where he pulled up a small rug that was covering the area of the floor he had been stripping. Keough said, "This stinks," referring to the small rug, and he threw the rug outside between the two officers. Keough had just barely stepped inside the trailer at this point, and "instantly" after he threw the rug outside, both officers

walked in around him, into the entryway. Keough never invited the officers into his home, and as soon as they came in, Keough said, "Hey!"

Officer Stearns asked, "Roy, would you consent to us searching the house?" and Keough said, "No." Then Officer Greer said, "Roy, could you show me the chemical solvent you used on the floor?" Keough said, "Yes, it's right here in the cabinet." He turned around to get the solvent, and when he turned back around, the officers were in his living room. Keough said to Officer Greer, "Excuse me, sir, do you have a search warrant?" and the officer responded, "Roy, we don't need a search warrant. We have probable cause."

Officer Stearns then said, "Roy, that door back there is locked. Why is that door locked?" (referring to the back bedroom door). Officer Stearns pointed at the keys on Keough's belt buckle and said, "Roy, are those the keys?" Keough replied, "Yes, sir," and Officer Stearns started walking toward him, saying in a loud, forceful voice, "Unlock that door. Unlock that door now." Because Officer Greer had stated the officers did not need a warrant to search Keough's home, Keough obeyed Officer Stearns's order and went back to unlock the bedroom door. Keough did not feel free to leave at that point, and felt he had to comply with the officers' demands.

After Keough was handcuffed and Officer Stearns was walking him back to the living room, Officer Stearns got on his radio, called another officer, and asked him to bring in a consent to search form. Keough said, "I thought you didn't need consent to search because you had probable cause." Keough signed the consent to search form, but stated he did so "with a signature that you would not be able to read because I did not want to sign it at the time and I felt threatened."

According to Keough, the officers "made up" their testimony about him consenting to a search of his home. He stated he "never once" gave them consent to search his person, his car, or his trailer. He testified, "Every time I was asked . . . if I would give them consent to search, I stated, 'No.'"

6

> Keough has been convicted of three prior felony drug offenses, and he has numerous other convictions in his criminal history. He stated, "I know when I'm free to leave and when I'm not," but stated he can be intimidated by police. He did not feel free to leave on the date in question and he felt intimated by Officers Greer and Stearns.

Report and Recommendation at pp. 2-7. Upon review of the record, the court adopts all of Judge Zoss's factual findings.

## II. LEGAL ANALYSIS

The standard of review to be applied by the district court to a report and recommendation of a magistrate judge is established by statute:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].

28 U.S.C. § 636(b)(1).

The Eighth Circuit Court of Appeals has repeatedly held that it is reversible error for the district court to fail to conduct a *de novo* review of a magistrate judge's report where such review is required. *See, e.g., Hosna v. Groose*, 80 F.3d 298, 306 (8th Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied*, 519 U.S. 860 (1996); *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (citing *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994)); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995) (also citing *Belk*).

As the court noted above, no party has filed an objection to Judge Zoss's Report and Recommendation, and it appears to the court upon review of Judge Zoss's findings and conclusions, that there is no ground to reject or modify them. Therefore, the court **accepts**

Judge Zoss's Report and Recommendation, and orders that defendant Keough's motion to suppress is **granted**.

    **IT IS SO ORDERED.**

    **DATED** this 17th day of August, 2005.

                                           MARK W. BENNETT
                                           CHIEF JUDGE, U. S. DISTRICT COURT
                                           NORTHERN DISTRICT OF IOWA